Filed 9/19/25  Limon v. County of Los Angeles CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| ROBIN LIMON, | B333050 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 22STCV25785) |
| v. | |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Rupert A. Byrdsong, Judge.  Affirmed in part; reversed in part and remanded with directions.

The Law Offices of Vincent Miller, Vincent Miller, Nick Sage, and James Jirn for Plaintiff and Respondent

Peterson, Bradford, Burkwitz, Gregorio, Burkwitz & Su, Avi Burkwitz, and Gayane Muradyan for Defendants and Respondents.

\* \* \* \* \* \* \* \* \* \*

Plaintiff and appellant Robin Limon contends she was wrongfully demoted and constructively terminated from her position as an assistant sheriff in the Los Angeles County Sheriff's Department (LASD). She filed this action against the County of Los Angeles, former sheriff Alex Villanueva, chief John Satterfield, and deputy David Yoo alleging whistleblower retaliation under Labor Code section 1102.5, retaliation under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; FEHA), and four other related claims.

Defendants and respondents County of Los Angeles, Satterfield, and Yoo filed a demurrer to plaintiff's first amended complaint. Villanueva did not demur and is not a party to this appeal. The trial court sustained defendants' demurrer in its entirety without leave to amend and entered a judgment of dismissal in their favor. Plaintiff appeals, arguing that all six causes of action were adequately pled. Alternatively, plaintiff contends the court abused its discretion in denying her the opportunity to amend her complaint with additional facts.

We affirm the judgment of dismissal entered in favor of defendants Satterfield and Yoo. We vacate the dismissal entered in favor of defendant County and remand for further proceedings consistent with this opinion.

**FACTUAL AND PROCEDURAL BACKGROUND**

**1. The operative first amended complaint**

Plaintiff's first amended complaint contains six causes of action: (1) whistleblower retaliation under Labor Code, § 1102.5 against the County; (2) retaliation in violation of FEHA against the County; (3) intentional infliction of emotional distress against the County, Villanueva, and Satterfield; (4) defamation against the County, Villanueva, Satterfield, and Yoo; (5) false light

2

against the County, Villanueva, Satterfield, and Yoo; and (6) violation of the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.; POBR) against the County. We assume the facts alleged in the first amended complaint to be true to resolve whether plaintiff has stated legally viable claims. (*Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1010 (*Centinela*).)

In March 2021, plaintiff held the rank of assistant sheriff in the LASD. Villanueva was the sheriff of the LASD and plaintiff's direct supervisor.

On March 10, 2021, an altercation, captured on video, occurred at the San Fernando Courthouse involving an inmate named Enzo Escalante and an LASD deputy, Douglas Johnson. The video showed Escalante throwing punches at Johnson, and Johnson eventually subduing Escalante for approximately three minutes by placing his knee on Escalante's neck and restricting his breathing. Escalante "struggled to breathe but did not die." We refer to the altercation as the Escalante incident.

After seeing the video, Robert Jones, a captain at the LASD's West Bureau, reported the Escalante incident to commander Allen Castellano, who in turn notified his supervisor, chief LaJuana Haselrig. Both Castellano and Haselrig have filed separate civil actions against the County that have been deemed related to this action: *Haselrig v. County of Los Angeles et al.* (Super. Ct. L.A. County, 2023, No. 22STCV29582) and *Castellano v. County of Los Angeles et al.* (Super. Ct. L.A. County, No. 22STCV32599).

Concerned by the content of the video, both Castellano and Haselrig asked plaintiff, who held a higher rank, to review it. All three discussed the video and agreed it looked like an excessive

3

and dangerous use of force that breached LASD protocols, and "bore similarity" to the use of force that resulted in the death of George Floyd in Minnesota the previous year.

Normal LASD protocols required an administrative investigation of the Escalante incident by the LASD's Internal Affairs Bureau (Internal Affairs) and a consultation with the LASD's Internal Criminal Investigations Bureau (Criminal Investigations). Plaintiff instructed Captain Jones to proceed according to protocol. Plaintiff also agreed with Castellano and Haselrig that Villanueva should see the video.

On March 15, 2021, after receiving a copy of the video from Haselrig, plaintiff took it to Villanueva's office to show him. When she arrived, undersheriff Timothy Murakami and lieutenant Anthony Blanchard were with Villanueva in his office. They all watched the video and agreed the video appeared to show an illegal use of force. Villanueva said the LASD did not need any "bad media." He told plaintiff he would "handle the matter." Plaintiff later told Castellano and Haselrig that Villanueva said he would take care of it.

For several months thereafter, Villanueva repeatedly thwarted the investigation into the Escalante incident and sought to cover it up because he did not want it to become public, presumably because it could affect his reelection campaign. Villanueva even sought to block a review of Escalante's actions during the incident because he did not want criminal charges brought against Escalante for punching Deputy Johnson since it would allow a defense attorney to gain access to the video.

One of Villanueva's first steps to cover up the incident was replacing Captain Jones in the West District with captain Jacqueline Sanchez. Villanueva told Sanchez not to follow LASD

4

procedure and protocols, but rather to ignore and delay efforts by plaintiff, Castellano, and Haselrig to have the Escalante incident investigated.

Through Castellano's efforts, LASD eventually opened an Internal Affairs investigation on March 31, 2021, but no consult with Criminal Investigations occurred until several months later. During that period, plaintiff, Haselrig, and Castellano often discussed their concerns about the delay in the investigation. They were "increasingly alarmed" when they found out the investigation into Deputy Johnson's treatment of Escalante had been severed from another case involving another inmate. The other inmate scuffled with another deputy at the same time as the Escalante incident but that deputy used "appropriate force." To further cover up the Escalante incident, Villanueva ordered the two investigations to be severed "so the softer one could be the one in the LASD computer system that would be seen by the Inspector General."

By July 2021, Castellano "created a paper trail of the cover-up," and his final report pointed out various irregularities and possible crimes about the LASD's response to the Escalante incident. Castellano's final report stated that LASD executives "above the rank of chief" directed the investigation. Castellano and Haselrig hoped this would "jump start" a proper investigation but Villanueva "continued to quash" it.

Thereafter, Angela Walton, who replaced Captain Sanchez as the new captain in the West District, saw the video of the Escalante incident. Captain Walton discussed the matter with Castellano and an investigation with Criminal Investigations was finally approved on November 22, 2021.

5

The next day, Villanueva, angered that a Criminal Investigations review had been opened, "initiated a rigged [Internal Affairs] investigation against Castellano, to pretend the delay committed by Villanueva was caused by a procedural mistake made by Castellano." This Internal Affairs investigation focused only on Castellano. Neither plaintiff nor Haselrig were subjects. The investigation did not follow normal protocols. Had it done so, plaintiff would have performed the initial review, but she was intentionally bypassed because she would have reported the false allegations made against Castellano. Plaintiff was prevented from providing testimony during the investigation. When contacted by chief Kelly Porowski, plaintiff "demanded" to be formally interviewed but her request was denied and she was also told not to speak with Castellano. The investigation was completed by March 2022. Castellano received a written reprimand for allegedly making a procedural error that caused the Escalante incident to be unreasonably delayed.

At some point during this time, plaintiff learned that lieutenant Steven Ruiz had attempted to get copies of "blank stationary [sic] from [her] office, apparently to forge notes from her" related to the Escalante incident.

On March 25, 2022, the Los Angeles Times obtained the Escalante video and published an article about "the Villanueva cover up." Villanueva reacted by publicly lying about the incident and saying he first learned of the video in October 2021, instead of March 15, 2021, when plaintiff showed it to him. Villanueva thereafter attempted to "concoct" a fake timeline to justify his response to the Escalante incident and to explain away the delayed investigation. Villanueva changed his story multiple times and was criticized accordingly in various media reports.

6

Because Castellano's final report said an unnamed executive "above the rank of chief" had directed the investigation of the Escalante incident, Villanueva decided to "frame" plaintiff, who was above the rank of chief, to deflect attention from himself. On March 29, 2022, Villanueva publicly announced that plaintiff and Haselrig tried to cover up the Escalante incident. Villanueva "manipulated" the media and published photographs of plaintiff and Haselrig as the "disgraced law enforcement officials" responsible for the LASD's mishandling of the Escalante incident. Villanueva also initiated a review by Criminal Investigations to determine who leaked the Escalante video to the Los Angeles Times to "intimidate other whistleblowers."

That same day, Villanueva retaliated against plaintiff for her role in the investigation of the Escalante incident, "for reporting Villanueva's misconduct and for pushing for LASD and [Villanueva] to do the right thing." Villanueva ordered plaintiff to "retire immediately" or "be demoted down by 4 ranks." Villanueva demoted plaintiff four ranks down to lieutenant and constructively terminated her.

Plaintiff filed a government claim on April 28, 2022, regarding her termination and received a right to sue letter.

After plaintiff filed her government claim, Villanueva further retaliated against her by sending a letter to a former felon who previously submitted a claim against the County for excessive use of force. The letter told the ex-felon a "fabricated story" that plaintiff had deleted video evidence relevant to his case, encouraging the ex-felon to file a lawsuit against plaintiff.

In May 2022, Villanueva leaked a "fake memo" that was "clearly written for purposes of litigation" to the press. The memo, "purportedly written" by Satterfield is "full of glaring

7

holes, inconsistencies, and deficiencies" and was intended to exonerate Villanueva and implicate plaintiff and Haselrig in the mishandling of the Escalante incident. The memo falsely states that plaintiff, Haselrig, Castellano, and Jones "attempted to cover up" the Escalante incident, and that Villanueva first learned of the "attempted cover up" on November 18, 2021, and he "ordered immediate action." The memo is a public document on the LASD's website "perpetually defaming" plaintiff and the other whistleblowers.

The fraudulent May 2022 memo also references a "fake, backdated [claim]" that an Internal Affairs investigation had been initiated against plaintiff regarding an unrelated personnel matter. The alleged investigation of plaintiff was "backdated" to March 2022 to "pretend that it was initiated before" the Escalante incident was leaked to the Los Angeles Times.

On August 8, 2022, Villanueva "posted an announcement" that the Los Angeles District Attorney had convened a grand jury regarding the LASD's handling of the Escalante incident. Villanueva, at the same time, falsely suggested plaintiff, Haselrig, and Castellano were the targets of that investigation by making references to the LASD's investigation having shown that personnel "falsely" portraying themselves as whistleblowers were responsible for any misconduct.

Villanueva defamed plaintiff again on August 31, 2022, along with Yoo. Villanueva and Yoo lied about plaintiff and the other whistleblowers and said the "frivolous lawsuits" filed by them against the County contained demonstrably false statements and were efforts to "avoid accountability or prosecution" for their own misdeeds regarding the Escalante incident.

Villanueva further defamed plaintiff on October 19 and October 26, 2022, by falsely claiming on the LASD's Facebook page and at a press conference, that plaintiff failed to appear for a deposition and "was afraid to testify under oath."

The first amended complaint also alleges, in addition to the above allegations concerning the Escalante incident, that there were numerous other interactions between plaintiff and Villanueva that caused Villanueva to develop an animus toward her and ultimately to retaliate against her. We discuss those allegations in more detail in part 1.2 of the Discussion below.

## 2. Procedural Summary

Plaintiff filed this action in August 2022. Before serving the original complaint, plaintiff filed her first amended complaint and served it on defendants. Defendants County, Satterfield, and Yoo filed a demurrer to the first amended complaint and a motion to strike. Defendants argued they were immune under various sections of the Government Code and also that plaintiff failed to state sufficient facts as to the essential elements of her claims. Plaintiff argued the statutory immunities cited by defendants did not apply. She also urged the court to allow her an opportunity to clarify her claims with additional facts if the court found any of her claims deficient.

The court sustained the demurrer in its entirety without leave to amend and placed the motion to strike off-calendar as moot. The court entered a judgment of dismissal in favor of defendants on August 25, 2023.

This appeal followed.

## DISCUSSION

Where the lower court has entered a judgment of dismissal after sustaining a demurrer without leave to amend, our review

9

is de novo. (*Centinela*, *supra*, 1 Cal.5th at p. 1010; accord, *Erlach v. Sierra Asset Servicing, LLC* (2014) 226 Cal.App.4th 1281, 1291 (*Erlach*).) For the limited purpose of reviewing the legal sufficiency of the challenged pleading, we " ' " 'treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' " ' " (*Centinela*, at p. 1010.) In determining whether the complaint states a cause of action, " ' "we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." ' " (*Ibid*.) We are not concerned at the pleading stage with evidentiary matters or the "plaintiff's ability to prove the allegations." (*Erlach*, at p. 1291.)

In assessing whether denying leave to amend was an abuse of discretion, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)

## 1. The statutory retaliation claims

### 1.1 Labor Code section 1102.5

Plaintiff's cause of action for whistleblower retaliation in violation of Labor Code section 1102.5 is alleged against the County. The County contends the demurrer was properly sustained because plaintiff failed to plead the essential elements of the claim. We disagree.

Labor Code section 1102.5 " 'reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation.' [Citation.] An

10

employee injured by prohibited retaliation may file a private suit for damages." (*Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 709 (*Lawson*); see also, Lab. Code, § 1105.) To plead a violation of section 1102.5, plaintiff must allege she engaged in whistleblowing activity protected by the statute, and that the protected activity was a contributing factor in her suffering an adverse employment action. (Lab. Code, § 1102.6; *Lawson* at p. 712.)

Plaintiff alleges the Escalante incident involved an excessive use of force that likely violated state law, federal law, and LASD protocols. Plaintiff adequately alleges, within the meaning of Labor Code section 1102.5, that she reported a violation of federal, state or local law. Plaintiff also alleges she reported the Escalante incident to Villanueva, her supervisor and head of the LASD, on March 15, 2021, and directed Castellano to follow LASD protocols to investigate the Escalante incident. The complaint adequately alleges plaintiff's report was made "to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance." (*Id.*, § 1102.5, subd. (b).) Furthermore, the statute provides that a report by a public employee to their employer, as occurred here, "is a disclosure of information to a government or law enforcement agency" within the meaning of the statute. (*Id.*, § 1102.5, subd. (e).) Finally, plaintiff alleges that because she was a whistleblower, the County demoted her four ranks and constructively terminated her.

While other factors, including the Los Angeles Times article, may also have played a role in the adverse employment actions plaintiff suffered, she adequately alleges that her initial

11

report of the Escalante incident to Villanueva in March 2021 and her subsequent efforts to ensure it was investigated were contributing factors. She was not required to allege they were the sole motivating factors. (Lab. Code, § 1102.6; *Lawson, supra*, 12 Cal.5th at p. 712.) We conclude plaintiff's allegations of whistleblower retaliation under Labor Code section 1102.5 are sufficient for the pleading stage. The demurrer to the first cause of action should have been overruled.

### 1.2    Government Code section 12940

Plaintiff also alleges an alternative theory against the County for retaliation under FEHA. "The elements of a claim for retaliation in violation of Government Code section 12940, subdivision (h), are: '(1) the employee's engagement in a protected activity . . . ; (2) retaliatory animus on the part of the employer; (3) an adverse action by the employer; (4) a causal link between the retaliatory animus and the adverse action; (5) damages; and (6) causation.' " (*Le Mere v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 237, 243.)

Plaintiff alleges a litany of workplace incidents and interactions with Villanueva that took place over an unspecified time period. She alleges these incidents created a hostile work environment and caused Villanueva to resent her and to retaliate against her.

For instance, plaintiff alleges she "witnessed and endured" Villanueva's abusive, racist, and sexist language about LASD colleagues, elected officials, and members of the public, as well as the use of homosexual and transgender slurs. Plaintiff also describes an incident with Undersheriff Murakami allegedly using a Japanese slur for an African American in front of several LASD employees. A sergeant who heard the slur failed to report

12

it and received discipline for failing to do so. Plaintiff alleges she recommended that Murakami be disciplined for using the slur and Villanueva "angrily dismissed" her concerns, telling her that Murakami "would not be disciplined or even investigated" for his behavior.

Plaintiff alleges she "pleaded" with Villanueva to be transparent, ethical and collaborative in running the LASD and "consistently opposed" his efforts to promote unqualified candidates but that he nevertheless promoted numerous individuals over her objection. She also alleges Villanueva improperly transferred or retaliated against numerous employees, including several individuals who were connected to a retired commander who had run against him to be Sheriff. Plaintiff alleges her attempts "to guide [Villanueva] to follow the law and engage in ethical conduct" towards these employees only angered Villanueva and he disregarded her advice.

In addition, plaintiff alleges she "continuously opposed" Villanueva allowing members of his reelection campaign to be involved in LASD matters. Similarly, she protested when Villanueva allowed LASD personnel, being paid by the County, to work on his reelection campaign. She alleges she "urged" Villanueva not to promote captain John Burcher to be his chief of staff because of various negative performance issues and his dual work with Villanueva's campaign which constituted a "theft of public monies." In another instance, plaintiff says that while she was working on negotiating a new contract with the Los Angeles Community College District, Villanueva allowed his campaign manager to be "illegally" engaged in discussions with one of the college district's board members. Plaintiff alleges Villanueva "angrily" dismissed plaintiff's advice on such matters.

13

Most of these largely conclusory allegations do not identify specific acts by plaintiff that qualify as protected activity under FEHA. However, we conclude plaintiff's allegations concerning the report about Undersheriff Murakami's use of a racial slur is an adequate allegation of protected activity under FEHA. Read fairly and in context, plaintiff's allegations adequately state an alternative theory of retaliatory demotion and termination based on workplace reporting of a FEHA violation. "It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory" even if that conduct ultimately is determined not to violate FEHA. (*Yanowitz v. L'Oreal USA, Inc*. (2005) 36 Cal.4th 1028, 1043.)

At oral argument, the County urged us to find this cause of action fails as a matter of law because plaintiff did not allege any temporal connection between the Murakami incident and plaintiff's demotion. Counsel for the County asserted the incident occurred some two years before plaintiff's demotion and that case law requires allegations demonstrating a close temporal connection, citing to *Loggins v. Kaiser Permanente International* (2007) 151 Cal.App.4th 1102 (*Loggins*).

Here, however, the date of the Murakami incident is not alleged in the first amended complaint, nor is the date alleged of when plaintiff spoke to Villanueva recommending Murakami face some sort of discipline over the incident. Moreover, *Loggins*, an appeal from the grant of summary judgment, does not purport to establish a bright-line rule fixing any particular length of time as too long to qualify as close temporal proximity under FEHA.

We conclude the resolution of whether there was the requisite degree of temporal proximity and causation between

14

plaintiff's discussions with Villanueva about the Murakami incident and plaintiff's demotion is better left to resolution on the factual merits.  The demurrer should have been overruled to the second cause of action.

## 2.   Intentional infliction of emotional distress

### 2.1   Defendant Satterfield

Under the Government Claims Act (Act), public entities are directly liable in tort only as "provided by statute."  (Gov. Code, § 815; *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1127.)  But public entities are vicariously liable for the acts of their employees "under the principle of respondeat superior." (*Zelig*, at p. 1128; accord, *Leon v. County of Riverside* (2023) 14 Cal.5th 910, 918 (*Leon*); see also Gov. Code, § 815.2, subds. (a), (b), § 820, subd. (a).)

For public employees, " ' "the rule is liability, immunity is the exception." ' "  (*Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 792.)  The Act makes public employees generally liable to the same extent as a private person for acts or omissions taken in the course and scope of employment, except to the extent a specific statute creates an immunity.  (*Leon, supra,* 14 Cal.5th at p. 918.)

Satterfield asserts discretionary act immunity under Government Code section 820.2, which provides that "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him." (*Ibid.*)  Not all acts requiring a public employee to choose among alternatives entail an exercise of discretion within the meaning of section 820.2.  (*Barner v. Leeds* (2000) 24 Cal.4th 676, 684–685 (*Barner*).)

15

*Barner* instructs that immunity under Government Code section 820.2 is reserved for " 'basic policy decisions.' " (*Barner, supra*, 24 Cal.4th at p. 685.) "[T]here is no basis for immunizing lower level decisions that merely implement a basic policy already formulated." (*Ibid*.) *Barner* cautions the scope of section 820.2 immunity " 'should be no greater than is required to give legislative and executive policymakers sufficient breathing space in which to perform their vital policymaking functions.' " (*Barner* at p. 685.)

To determine whether the immunity applies, courts look at whether the public employee's acts were "operational" or "policy" level decisions. (*Barner, supra*, 24 Cal.4th at p. 685.) For instance, a decision by a city clerk "to discuss a particular matter with the press may have been within the clerk's discretion (as that term is used in common parlance), it was not 'in the nature of a "basic policy decision" made at the "planning" stage of [the public entity's] operations' but rather fell within the category of routine duties incident to the normal operations of the office of the clerk." (*Ibid.*, citing *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 415 (*Sanborn*).)

Similarly, decisions by a public employee supervisor regarding "job assignments, training and promotion" were found to be operational level acts that did not qualify as the type of policy level decisions immune under the statute. (*Taylor v. City of Los Angeles Dept. of Water & Power* (2006) 144 Cal.App.4th 1216, 1238–1239, overruled in part on other grounds in *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1173.)

Here, the alleged wrongful acts by Satterfield are minimal and concern only the alleged drafting of the May 2022 memo, over a month after plaintiff suffered the adverse employment

16

action by Villanueva and after she filed her government claim. Plaintiff does not allege unequivocally that Satterfield was responsible for drafting the memo, only that it was "purportedly" written by Satterfield acting as Villanueva's chief of staff and that "Whoever wrote this memo participated in the cover up himself/herself by writing it." Moreover, plaintiff alleges the memo was "clearly written for purposes of litigation" and was leaked to the media and posted on the LASD website. There are no allegations Satterfield was responsible for leaking the memo or posting it.

Satterfield cites to *Caldwell v. Montoya* (1995) 10 Cal.4th 972 (*Caldwell*) and argues that all personnel decisions are discretionary and necessarily immune under Government Code section 820.2.

*Caldwell* involved a vote by the elected governing board of a school district not to renew the superintendent's contract. (*Caldwell*, *supra*, 10 Cal.4th at pp. 975–976.) The Supreme Court concluded the individual members of the board were entitled to discretionary immunity and could not be held liable for the superintendent's claims of age and race discrimination under FEHA. (*Ibid*.) *Caldwell* explained that " 'discretionary act' immunity extends to 'basic' governmental policy decisions entrusted to broad official judgment. The decision of an elected school board whether to replace the school district's highest appointed official is such a determination. The board's free, open, and candid consideration of an issue of this magnitude should not be subject to judicial interference by means of lawsuits seeking to hold individual board members accountable for their motives." (*Id*. at p. 976.)

17

We do not read *Caldwell* as eliminating the requirement to assess, on a case-by-case basis, whether a personnel decision is more appropriately characterized as a policy-level decision or an operational-level decision. More importantly, Satterfield is not alleged to have engaged in making any personnel decisions. None of the conduct Satterfield engaged in can be characterized as arising from policy-level decisionmaking related to personnel decisions or otherwise. Discretionary act immunity does not apply.

Satterfield's argument for immunity under Government Code section 821.6 is equally unavailing. Section 821.6 states that "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."

The Supreme Court recently reaffirmed the narrow scope of Government Code section 821.6 immunity in *Leon*, *supra*, 14 Cal.5th 910, explaining that "[i]n enacting section 821.6, the Legislature conferred absolute immunity against claims based on injuries caused by wrongful prosecutions, *but not other types of injuries* inflicted in the course of law enforcement investigations." (*Leon*, at p. 928, italics added.) *Leon* disapproved of numerous decisions that expanded the scope of the immunity, to the extent they were inconsistent with its holding, including three cases cited by defendants here: *Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033; *Ingram v. Flippo* (1999) 74 Cal.App.4th 1280; and *Amylou R. v. County of Riverside* (1994) 28 Cal.App.4th 1205. (*Leon*, at pp. 930–931.)

There are no allegations sounding in malicious prosecution. Plaintiff's claim is not based on Satterfield having wrongfully

18

initiated or prosecuted an official proceeding against her. Government Code section 821.6 immunity does not apply.

As for the essential elements of an intentional infliction claim, we agree plaintiff has failed to plead sufficient facts to state this tort theory against Satterfield.

A cause of action for intentional infliction of emotional distress requires the pleading of facts showing extreme and outrageous behavior specifically intended to cause harm. "A defendant's conduct is 'outrageous' when it is so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' [Citation.] And the defendant's conduct must be ' " 'intended to inflict injury or engaged in with the realization that injury will result.' " ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050–1051 (*Hughes*); see also, CACI No. 1600.)

Whether a defendant's conduct "can reasonably be found to be outrageous is [a] question of law that must initially be determined by the court. If reasonable persons may differ, it is for the jury to determine whether the conduct was, in fact, outrageous." (5 Witkin Sum. Cal. Law (2018) Torts § 525.)

We conclude plaintiff's allegations of wrongdoing against Satterfield do not, as a matter of law, rise to the level of extreme and outrageous conduct necessary for a viable claim of intentional infliction of emotional distress. Plaintiff alleges only that Satterfield may have drafted the May 2022 memo ("clearly written for purposes of litigation"), a month after her termination, that contained false statements about her. Plaintiff does not allege Satterfield was responsible for leaking or posting the memo or any other affirmative conduct related to her demotion or constructive termination. Such conduct is not "so ' " 'extreme as to exceed all bounds of that usually tolerated in a

19

civilized community.' " ' " (*Hughes*, *supra*, 46 Cal.4th at p. 1051; see, e.g., *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1609 ["denial of benefits for an investigational treatment" and failure to advise of statutory right to review of decision not extreme and outrageous conduct as a matter of law]; cf. *Kiseskey v. Carpenters' Trust for So. California* (1983) 144 Cal.App.3d 222, 229–230 [threats of physical harm and death to plaintiff and his family for failing to sign new union agreement were sufficiently outrageous].)

Plaintiff urges us to find the trial court abused its discretion in denying her leave to amend.  Before serving her original complaint, plaintiff amended her allegations and filed a 62-page first amended complaint.  Plaintiff says she can plead additional facts to cure any deficiencies, but nothing in her briefing identifies what specific factual details can be added to cure the legal defects in this cause of action.  Plaintiff has not discharged her burden of demonstrating an abuse of discretion in the denial of leave.  (*Blank*, *supra*, 39 Cal.3d at p. 318.) Satterfield's demurrer to the third cause of action was properly sustained without leave to amend.

### 2.2   Defendant County

The remaining basis for liability against the County under this theory is vicarious liability for the acts taken by Villanueva. The County asserts the same arguments as Satterfield.

The gravamen of plaintiff's allegations against Villanueva arise from his public statements disparaging her.  Plaintiff alleges that on March 29, 2022, the same day Villanueva forced her to choose between retirement and demotion, Villanueva held a press conference and blamed her for an attempted coverup of the Escalante incident.  She also alleges Villanueva engaged in

20

various acts that occurred after the press conference, including posting an announcement about a grand jury investigation, leaking the May 2022 memo to the press, and making statements related to plaintiff's lawsuit.

None of plaintiff's allegations sound in malicious prosecution. For the same reasons explained above, immunity under Government Code section 821.6 does not apply.

As for immunity under Government Code section 820.2, we are guided by the Supreme Court's pronouncement that the scope of discretionary act immunity " 'should be no greater than is required to give legislative and executive policymakers sufficient breathing space in which to perform their vital policymaking functions.' " (*Barner*, *supra*, 24 Cal.4th at p. 685.) On the facts pled, we are not persuaded the acts alleged here qualify as "vital policymaking" decisions.

However, the allegations concerning Villanueva's disparaging statements about plaintiff made during press conferences, or in other public forums, are barred by the absolute privilege codified at Civil Code section 47, subdivision (a), commonly referred to as the official act privilege. Section 47, subdivision (a), provides that "[a] privileged publication or broadcast is one made: [¶] (a) In the proper discharge of an official duty." (*Ibid*.)

The County did not argue the official act privilege, and the trial court did not state the bases for its ruling so we do not know whether the privilege played any part in the court's decision to sustain the demurrer. However, it is well-established that "[w]e will affirm an order sustaining a demurrer on any proper legal ground whether or not the trial court relied on that theory or it

21

was raised by the defendant." (*Summerfield v. City of Inglewood* (2023) 96 Cal.App.5th 983, 992.)

In *Kilgore v. Younger* (1982) 30 Cal.3d 770 (*Kilgore*), the plaintiff sued the Attorney General for defamation, intentional infliction of emotional distress, and invasion of privacy based on statements made by the Attorney General at a press conference in which he adopted statements in a report, and released copies of the report to the press, suggesting the plaintiff was involved in an illegal bookmaking operation. (*Id.* at pp. 774–778.) The Supreme Court found the official act privilege applied and affirmed the Attorney General's judgment of dismissal following a successful demurrer. (*Ibid.*)

*Kilgore* explained that the official act privilege of Civil Code section 47, subdivision (a), (formerly section 47(1)), is absolute. (*Kilgore*, *supra*, 30 Cal.3d at p. 778.) "Unlike qualified privileges, it is not negated by malice or other personal motivation . . . . Further, the privilege is equally applicable to defamation and other actions, excepting only those for malicious prosecution. [Citation.] For the absolute privilege to attach, the public official need only be properly discharging an official duty." (*Ibid.*)

Villanueva's statements in public about the LASD's handling and investigation of the Escalante incident were unquestionably statements about matters of a public interest that fell within the scope of his duties as the head of the LASD. Those statements, even if made with malicious intent, are protected by the absolute privilege of Civil Code section 47, subdivision (a). (*Maranatha Corrections, LLC v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1075, 1089 [" 'Because a public official's duty includes the duty to keep the public informed of his or her management of the public business,

22

press releases, press conferences and other public statements by such officials are covered by the "official duty" privilege' "].)

The balance of plaintiff's allegations against Villanueva consist of statements of opinion about the relative merit of plaintiff's lawsuit, or about the grand jury investigation. The grand jury allegations lack any factual context about the forum in which they were made to determine whether the official act privilege or any other privilege applies. But standing alone, these allegations, to the extent they are actionable, are insufficient to support an intentional infliction of emotional distress claim. They do not rise to the level of extreme and outrageous conduct necessary for a viable claim of intentional infliction of emotional distress. (*Hughes*, *supra*, 46 Cal.4th at p. 1051.)

As we already explained above, plaintiff has not discharged her burden of demonstrating an abuse of discretion in the denial of leave. (*Blank*, *supra*, 39 Cal.3d at p. 318.) The County's demurrer to the third cause of action was properly sustained without leave to amend.

## 3.    Defamation and false light

Plaintiff's defamation and false light claims are alternate theories of liability based on the same allegations of wrongdoing pled in plaintiff's intentional infliction of emotional distress claim.

### 3.1    Defendants Satterfield and Yoo

Satterfield and Yoo assert they have discretionary act immunity under Government Code section 820.2. For the same reasons already explained in part 2.1 above, we are not persuaded discretionary act immunity under section 820.2 applies on these facts. None of the conduct Satterfield and Yoo

23

are alleged to have engaged in can be characterized as arising from policy level decisionmaking.

We must therefore decide whether plaintiff has alleged sufficient facts on the essential elements to state either of these theories against Satterfield or Yoo. We conclude she has not.

Defamation is "the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage. [Citations.] Publication, which may be written or oral, is defined as a communication to some third person who understands both the defamatory meaning of the statement and its application to the person to whom reference is made." (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1179–1180.)

In order to plead defamation, plaintiff was required to allege the intentional publication of a provably false, unprivileged factual assertion. (*Comstock v. Aber* (2012) 212 Cal.App.4th 931, 948.) "As Witkin distills the pleading rule, 'It is sometimes said to be a requirement, and it certainly is the common practice, to plead the exact words or the picture or other defamatory matter. The chief reason appears to be that the court must determine, as a question of law, whether the defamatory matter is on its face or capable of the defamatory meaning attributed to it by the innuendo. Hence, the complaint should set the matter out verbatim, either in the body or as an attached exhibit.' " (*Ibid.*) Plaintiff has not done so.

The only allegation against Satterfield concerns the possibility he may have drafted an internal memo at Villanueva's direction that plaintiff concedes was written "for purposes of litigation." She alleges the memo was posted to the LASD website, and therefore made public, but does not allege any facts

24

that Satterfield was responsible for doing so. To be actionable, a publication must be made by the defendant. "Only one who 'takes a responsible part' in the publication is liable for the defamation." (5 Witkin Sum. Cal. Law (2018) Torts § 630.)

Plaintiff alleges that Yoo, in conjunction with Villanueva, made statements about the frivolous and false nature of plaintiff's claims in this action. She alleges the statements were made on August 31, 2022, but she does not allege publication— she does not allege to whom they were made or in what forum they were made. Plaintiff also has not alleged the statements with specificity to discern if they are actionable statements of fact or nonactionable statements of opinion about the relative merits of pending litigation

The demurrer was properly sustained as to both Satterfield and Yoo. Plaintiff has not demonstrated the court abused its discretion in denying her leave to amend. (*Blank*, *supra*, 39 Cal.3d at p. 318.)

### 3.2 Defendant County

The County asserts absolute immunity under Government Code section 818.8 which provides that "A public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional."

The absolute immunity conferred on public entities by Government Code section 818.8, as well as the corresponding immunity for public employees under section 822.2, is limited in scope. "As the California Supreme Court stated in *Johnson v. State* (1968) 69 Cal.2d 782, 800 (*Johnson*), the Legislature employed the term 'misrepresentation' in a narrow, rather than expansive sense: ' "[Misrepresentation]," as a tort distinct from

25

the general milieu of negligent and intentional wrongs, *applies to interferences with financial or commercial interest*.  The Legislature designed section 818.8 to exempt the governmental entity from this type of liability.' " (*Michael J. v. Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859, 868, italics added.)

Since *Johnson*, *supra*, 69 Cal.2d 782, courts have consistently refused to interpret the immunity for misrepresentations more broadly.  (See, e.g., *Finch Aerospace Corp. v. City of San Diego* (2017) 8 Cal.App.5th 1248, 1253 [Gov. Code, §§ 818.8 & 822.2 "do not apply to slander of title" which is a form of injurious falsehood and not deceit]; *City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 382–383 [under *Johnson*, misrepresentation immunities do not apply to tort causes of action based on reputational harm]; *Bastian v. County of San Luis Obispo* (1988) 199 Cal.App.3d 520, 533 [§§ 818.8 & 822.2 did not immunize deputy sheriff and county for claims of misrepresentation not predicated on interference with a financial or commercial interest].)

The defamatory allegations at issue here are not based on interference with a commercial or financial interest.  Plaintiff alleges reputational harm arising from statements made by Villanueva that she was a "disgraced" official who had tried to cover up the Escalante incident and similar statements posted on the LASD's website.  We therefore reject the County's argument that it is immune under Government Code section 818.8.  We are not persuaded to conclude otherwise by the County's reliance on a case that predates the Supreme Court's seminal discussion of section 818.8 in *Johnson*, *supra*, 69 Cal.2d 782.

26

The only remaining ground for imposing liability against the County is vicarious liability for the alleged defamation by Villanueva. But, as we explained in part 2.2 above, Villanueva's public statements about the LASD's handling and investigation of the Escalante incident are protected by the official act privilege. (Civ. Code, § 47, subd. (a).)

As with her other claims, plaintiff has not demonstrated the court abused its discretion in denying her leave to amend. The demurrer was properly sustained without leave. (*Blank*, *supra*, 39 Cal.3d at p. 318.)

### 3.3    False Light

The false light claim, based on the same conduct as the defamation claim, is legally inadequate for the same reasons discussed above.

## 4.    POBR Claim

Plaintiff's sixth cause of action is based on a violation of Government Code section 3304, subdivision (d)(1), which provides that no punitive action shall be taken against a public safety officer for any allegation of misconduct if the investigation is not completed within one year of the public agency's discovery of the misconduct.

The only argument the County urges as to why plaintiff's claim is not viable is because she did not allege any disciplinary action—she only alleges Villanueva demanded she retire or be demoted. Defendant's contention lacks merit. Plaintiff alleges she was demoted four ranks from assistant sheriff to lieutenant, without notice or proper compliance with POBR, including the one-year statute set forth in Government Code section 3304, subdivision (d)(1). Demotion is considered a punitive action under POBR. (Gov. Code, § 3303.)

27

At oral argument, the County raised a new argument that plaintiff's claim is barred because her allegations demonstrate she was never served with a letter of intent under Government Code section 3304, subdivision (d). "We need not consider points raised for the first time at oral argument." (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 232, fn. 6.) In any event, plaintiff's claim of noncompliance with POBR appears to be based in part on the County's failure to serve a letter of intent to discipline and to conduct an investigation before demoting her for alleged mishandling of the Escalante incident. Thus, the County's oral argument is consistent with plaintiff's theory and does not foreclose her claim at the pleading stage. The County's demurrer to the sixth cause of action should have been overruled.

## DISPOSITION

The judgment of dismissal in favor of John Satterfield and David Yoo is affirmed.

The judgment of dismissal in favor of the County of Los Angeles is vacated. The order sustaining the demurrer to the first amended complaint is affirmed in part, reversed in part, and the case is remanded to the superior court for further proceedings consistent with this opinion.

On remand, the superior court is directed to enter a new order on the demurrer by the County of Los Angeles as follows: the demurrer is overruled on the first cause of action against the County of Los Angeles for retaliation under Labor Code section 1102.5, the second cause of action against the County of Los Angeles for retaliation in violation of Government Code section 12940, and on the sixth cause of action against the County of Los Angeles for violation of the Public Safety Officers

28

Procedural Bill of Rights Act.  The demurrer is sustained without leave to amend on the third cause of action for intentional infliction of emotional distress, the fourth cause of action for defamation and the fifth cause of action for false light.

The parties shall bear their own costs of appeal.


VIRAMONTES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.


29